UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) ) ) ) | Case No. 18bk19801 |
| Nottia M. Reed, | ) ) | Chapter 7 |
| Debtor. | ) ) ) |  |
| Bertha McGee, | ) ) ) |  |
| Plaintiff, | ) ) | Adversary No. 18ap00837 |
| v. | ) ) | Judge Timothy A. Barnes |
| Nottia M. Reed, | ) ) ) |  |
| Defendant. | ) ) ) |  |

TIMOTHY A. BARNES, Judge.

MEMORANDUM DECISION

The matter before the court arises out of the Complaint for Determination of Dischargeability of Debt [Adv. Dkt. No. 1] (the "Complaint"), filed by Bertha McGee (the "Plaintiff"), in the above-captioned adversary case (the "Adversary").  The Complaint seeks a determination of dischargeability of debt under sections 523(a)(2)(A) and (a)(4) of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code") for funds withdrawn by Nottia M. Reed (the "Debtor") from the Plaintiff's bank account, held jointly with Curtis Williams, Jr. ("Curtis"), the Debtor's father.

For the reasons set forth herein, the Plaintiff has established the nondischargeability of the debt due to the Plaintiff under Count I of the Complaint, which relies on section 523(a)(2)(A) of the Bankruptcy Code.  The Plaintiff, however, has not established that the debt due to her is nondischargable under section 523(a)(4) of the Bankruptcy Code.

JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under the Bankruptcy Code.  28 U.S.C. § 1334(a).  The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code.  28 U.S.C. § 1334(b).  District courts may refer these cases to the bankruptcy judges for their districts.  28 U.S.C. § 157(a).  In accordance with section

157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois.  N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred has statutory authority to enter final judgment on any proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code.  28 U.S.C. § 157(b)(1).  Bankruptcy judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code.  28 U.S.C. § 157(b)(3).  As to the former, the bankruptcy court may hear and determine such matters.  28 U.S.C. § 157(b)(1).  As to the latter, the bankruptcy court may hear the matters, but may not decide them without the consent of the parties.  23 U.S.C. §§ 157(b)(1), (c).  Absent consent, the bankruptcy court must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected."  28 U.S.C. § 157(c)(1).

In addition to the foregoing considerations, a bankruptcy judge must also have constitutional authority to hear and determine a matter.  *Stern v. Marshall,* 564 U.S. 464 (2011).  Constitutional authority exists when a matter originates under the Bankruptcy Code or, in noncore matters, where the matter is either one that falls within the public rights exception, *id.*, or where the parties have consented, either expressly or impliedly, to the bankruptcy court hearing and determining the matter.  *See, e.g.*, *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1939 (2015) (parties may consent to a bankruptcy court's jurisdiction); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough").

As a complaint opposing dischargeability of a debt arises only in relation to a bankruptcy case, this matter is expressly a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (I).  In accordance with *Stern*, 564 U.S. at 499, the bankruptcy court has authority to decide matters of nondischargeability, as the dischargeability of a debt is necessarily a matter that would stem from the bankruptcy itself.  "A bankruptcy judge has constitutional authority to enter final judgment as to dischargeability." *Parkway Bank & Tr. v. Casali* (*In re Casali*), 526 B.R. 271, 274 (Bankr. N.D. Ill. 2015) (Schmetterer, J.); *see also Wan Ho Indus. Co., Ltd. v. Hemken* (*In re Hemken*), 513 B.R. 344, 350 (Bankr. E.D. Wis. 2014).  Further, each of the parties has either expressly or impliedly consented to this court's exercising authority over this matter.

As a result, the court has jurisdiction, statutory authority and constitutional authority to hear and enter final judgment on the Complaint.

PROCEDURAL HISTORY[1]

The Plaintiff filed the Complaint on October 11, 2018, alleging that she is owed a debt by the Debtor in the amount of $15,749.00, representing $15,200.00 (the "Funds") withdrawn by the

---

[1]     The court has also taken into consideration all exhibits submitted along with the documents listed herein.  As this is not an exhaustive list of the filings submitted in the Adversary, the court has taken judicial notice of the contents of the docket in the Adversary.  *See Levine v. Egidi,* Case No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 1989) (Goldgar, J.) (recognizing same).

Debtor from a savings account held jointly by the Plaintiff and Curtis (the "Savings Account") and a separate checking account titled only in Curtis's name (the "Checking Account" and together with the Savings Account, the "Accounts"), plus $549.00 in costs for the Plaintiff's filing of a complaint in Cook County Court. In Count I of the Complaint, the Plaintiff argues that the debt due to her is nondischargeable under section 523(a)(2)(A) because the debt was incurred by actual fraud committed by the Debtor. Compl., at ¶¶ 10–14. The Plaintiff alleges that the Debtor, after the death of Curtis, presented TCF Bank with a power of attorney for Curtis to remove the Funds from the Plaintiff's control. *Id.* at ¶¶ 7, 8, 12. The Plaintiff argues that the Debtor's fraudulent intent is evidenced by her withdraw of the Funds after the death of Curtis without informing the Plaintiff of the withdrawal or the bank of Curtis's passing. *Id.* at ¶ 13. Such Funds, the Plaintiff argues, were rightfully hers. *Id.* at ¶ 12. The Plaintiff argues therefore that the Debtor committed fraud. *Id.*

Count II of the Complaint seeks a finding that the debt due to the Plaintiff is nondischargeable under section 523(a)(4) as it was obtained by larceny. Compl., at ¶¶ 15–16. The Plaintiff argues that the Debtor committed larceny when she obtained ownership over the Funds that were rightfully the Plaintiff's without the Plaintiff's consent. *Id.* at ¶ 17–19. The Plaintiff alleges that the Funds were used for the Debtor's benefit and not for the benefit of Curtis. *Id.* at ¶¶ 9, 15.

On November 16, 2018, the Debtor filed her Answer to Plaintiff's Complaint to Determine Dischargeability of Indebtedness [Adv. Dkt. No. 8] (the "Answer"). Through the Answer, the Debtor denies that that her withdrawal was fraudulent or created a debt. Answer, at ¶¶ 12–14. She denies the allegation that she did not consult with the Plaintiff or get the Plaintiff's permission before using the power of attorney to withdraw the Funds. *Id.* at ¶ 8. Further, the Debtor denies that the Funds she withdrew were not for the benefit of Curtis and only for her personal use and benefit. *Id.* at ¶ 9. The Debtor also denies that she had the intent to defraud the Plaintiff. *Id.* at ¶ 13.

On March 9, 2021, the court conducted a trial on the matter (the "Trial"). At the conclusion of the Trial, the matter was taken under advisement. This memorandum decision constitutes the court's determination after Trial of the matters in the Complaint and concludes all open issues in the Adversary.

FINDINGS OF FACT

From the review and consideration of the procedural background, as well as the evidence presented at the Trial and the filings in this Adversary, the court determines the salient facts to be and so finds as follows:[2]

1.  The Plaintiff was married to Curtis from August 21, 2009, until his death on May 3, 2017. Tr. at pp. 35–36, Mar. 9, 2021; Joint Pretrial Statement [Adv. Dkt. No. 63] at ¶ B.1.

---

[2]  This Memorandum Decision constitutes the court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules" and, individually, "Bankruptcy Rule"). A separate judgment order will be entered pursuant to Bankruptcy Rule 9021. Adjudicative facts may also be found and determined throughout this Memorandum Decision. To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.

3

2.    The Debtor is Curtis's daughter.  Tr. at p. 36, Mar. 9, 2021; Joint Pretrial Stmt. at ¶ B.2.

3.    Giovanne Williams is the Debtor's sister and Curtis's daughter.  Joint Pretrial Stmt. at ¶ B.3.

4.    Tarrence Crawford is the Debtor's cousin.  Joint Pretrial Stmt. at ¶ B.4.

5.    Caprice Owens is the Debtor's daughter.  Tr. at p. 36, Mar. 9, 2021; Joint Pretrial Stmt. at ¶ B.5.

6.    The Plaintiff and Curtis were joint holders of the Savings Account at TCF Bank at the time of Curtis's death.  Joint Pretrial Stmt. at ¶ B.6.

7.    The Savings Account was a payable-on-death account.  Pl. Ex. 3; Tr. at p. 130, Mar. 9, 2021.

8.    Curtis also held the separate Checking Account at TCF Bank that was solely in his name when he died.  Joint Pretrial Stmt. at ¶ B.7.

9.    Curtis became ill at the end of 2016 and went to live in a nursing home.  Tr. at pp. 38–39, Mar. 9, 2021.

10.   The Debtor interacted with him regularly and, in January 2017, she had Curtis execute a form power of attorney (the "Power of Attorney"), designating the Debtor to have control over Curtis's assets.  Tr. at pp. 80–81, Mar. 9, 2021; Pl.'s Exh. 6.

11.   The Power of Attorney was witnessed by Caprice Owens and notarized by Tarrence Crawford.  Tr. at p. 81, Mar. 9, 2021; Pl. Exh. 6.

12.   The Power of Attorney authorized the Debtor generally to control Curtis's assets, but made no mention of any intent to transfer assets to the Debtor or anyone else.  Tr. at p. 100, Mar. 9, 2021; Pl.'s Exh. 6.

13.   Curtis died on May 3, 2017.  Tr. at p. 36, Mar. 9, 2021; Joint Pretrial Stmt. at ¶ B.10.

14.   Curtis apparently died without a will.  Tr. at pp. 39, 60, Mar. 9, 2021; Joint Pretrial Stmt. at ¶ B.29.

15.   On May 3, 2017, the Debtor went to a TCF Bank branch in Oak Lawn, Illinois, with the Power of Attorney allegedly signed by Curtis.  Joint Pretrial Stmt. at ¶ B.8.

16.   On May 3, 2017, the TCF Bank employee who handles powers of attorney was absent and Debtor left without making any transaction.  Joint Pretrial Stmt. at ¶ B.9.

17.   On May 8, 2017, the Debtor presented the Power of Attorney at TCF Bank and withdrew $14,000.00 from the Savings Account and $1,200.00 from the Checking Account.  Tr. at p. 81, Mar. 9, 2021; Joint Pretrial Stmt. at ¶¶ B.11, B.13.

18.   After the Debtor withdrew the Funds, there was a balance of $6,113.96 in the Savings Account and $1,818.78 in the Checking Account.  Joint Pretrial Stmt. at ¶¶ B.12, B.14.

4

19. The Debtor learned that the Plaintiff had an interest in the Savings Account and still withdrew the Funds. Tr. at pp. 103-04, Mar. 9, 2021;

20. The Debtor never notified the Plaintiff of the Power of Attorney. Tr. at pp. 102-03, Mar. 9, 2021.

21. The Debtor never notified the Plaintiff that she withdrew the Funds from the Accounts. Joint Pretrial Stmt. at ¶¶ B.19-20.

22. After the Plaintiff was notified by TCF Bank that two-thirds of the balance in each of the Accounts went missing, she filed a complaint with the Oak Lawn Police Department saying the money was stolen from her. Tr. at p. 62, Mar. 9, 2021; Joint Pretrial Stmt. at ¶ B.22.

23. When the Oak Lawn Police Department then called the Debtor in, she brought an altered Power of Attorney with her. Tr. at pp. 106–09, Mar. 9, 2021; Joint Pretrial Stmt. at ¶¶ B.24–26.

24. The altered Power of Attorney indicated that Curtis told her he wanted his accounts split three ways between Debtor, Giovanne Williams, and the Plaintiff. Tr. at pp. 106–09, Mar. 9, 2021; Joint Pretrial Stmt. at ¶¶ B.26, B.28.

25. The Debtor did not inform the Oak Lawn Police Department that the Power of Attorney had been altered. Tr. at p. 107, Mar. 9, 2021.

26. When the Oak Lawn Police Department discovered the Power of Attorney was altered, they called the Debtor back in, at which time the Debtor admitted that she altered the Power of Attorney. Tr. at p. 108, Mar. 9, 2021; Joint Pretrial Stmt. at ¶¶ B.27–28.

27. The Oak Law Police Department did not charge the Debtor with any crime. Tr. at p. 63, Mar. 9, 2021; Joint Pretrial Stmt. at ¶ B.30.

28. The Plaintiff filed a lawsuit against the Debtor based on the withdraw of the Funds from the Accounts. Tr. at pp. 66, 74, Mar. 9, 2021.

29. That lawsuit was apparently stayed on the commencement of the Debtor's underlying bankruptcy case.

## DISCUSSION

The Complaint is comprised of two counts: Count I asserts a claim for nondischargeability under section 523(a)(2)(A) on the basis of actual fraud; Count II pleads that the debt due to the Plaintiff is nondischargeable under section 523(a)(4), which bars the discharge of debts created by larceny. The court will consider each count in turn.

A.    Count I: 11 U.S.C. § 523(a)(2)(A)

In Count I of the Complaint, the Plaintiff seeks a determination of the dischargeability of her claim against the Debtor, relying on subsection (a)(2)(A) of section 523 in so doing.

5

The Supreme Court "has certainly acknowledged that a central purpose of the [Bankruptcy] Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.' *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934). But in the same breath that [the Supreme Court has] invoked this 'fresh start' policy, [they] have been careful to explain that the [Bankruptcy] Act limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.' *Ibid*." *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991). This is in keeping with the Bankruptcy Code itself, wherein Congress excluded from that fresh start debts created by fraud. 11 U.S.C. § 523(a)(2)(A).

To further the policy of giving the debtor a fresh start, exceptions to the discharge of a debt are to be construed strictly against a creditor and liberally in favor of a debtor. *In re Crosswhite*, 148 F.3d 879, 881 (7th Cir. 1998). A party seeking to establish that a debt is nondischargeable bears the burden of proof. *Selfreliance Fed. Credit Union v. Harasymiw (In re Harasymiw),* 895 F.2d 1170, 1172 (7th Cir. 1990). The discharge exception must be established by a preponderance of the evidence. *Grogan,* 498 U.S. at 291.

Under section 523, a plaintiff must first establish that the debtor owes him or her a debt. *See Zirkel v. Tomlinson (In re Tomlinson)*, Adv. No. 96 A 1539, 1999 WL 294879, at *7 (Bankr. N.D. Ill. May 10, 1999) (Katz, J.). Second, a plaintiff must show that the debt falls within one of the specified grounds under section 523(a)(2)(A). *Wachovia Secs., LLC v. Jahelka (In re Jahelka)*, 442 B.R. 663, 668 (Bankr. N.D. Ill. 2010) (Goldgar, J.). Three separate grounds for holding a debt to be nondischargeable are included under section 523(a)(2)(A): false pretenses; false representation; and actual fraud. *Id.*; *see also Deady v. Hanson (In re Hanson)*, 432 B.R. 758, 771 (Bankr. N.D. Ill. 2010) (Squires, J.); *Bletnitsky v. Jairath (In re Jairath)*, 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001) (Schmetterer, J.).

1.      *Existence of Debt*

Before reaching the issue of dischargeability, it must first be established that the Debtor owes the underlying obligation. In other words, there first needs to exist a debt to discharge.

"The Bankruptcy Code defines 'debt' very broadly, as 'liability on a claim, 11 U.S.C. § 101(12), and 'claim' very broadly, as any 'right to payment,' whether liquidated or unliquidated, disputed or undisputed, legal or equitable. [11 U.S.C.] § 101(5); *see generally Johnson v. Home State Bank*, 501 U.S. 78, 83–84 and n. 5 (1991)." *McClellan v. Cantrell*, 217 F.3d 890, 895 (7th Cir. 2000).

Here, the Plaintiff alleges that the Debtor's taking of the Funds created a debt. The Debtor denies that allegation.

At the same time, the Debtor admits she took the Funds and has scheduled the Plaintiff as having a disputed claim. Official Form 106E/F, Schedule E/F: Creditors Who Have Unsecured Claims – Amended [Dkt. No. 45], at 4.2, *In re Nottia M. Reed*, Case No. 18bk19801 (Bankr. N.D. Ill. filed July 16, 2018) (Barnes, J.). The Plaintiff has also filed a claim in the Debtor's bankruptcy based on the Plaintiff's state court case against the Debtor, which relies on the Debtor taking the Funds. *See* Claim No. 3-1, *In re Nottia M. Reed*, Case No. 18bk19801 (Bankr. N.D. Ill. filed July 16, 2018) (Barnes, J.).

Thought the Debtor denies that a debt exists, the facts in evidence and the applicable law make clear that is not the case. The Debtor has provided no evidence of having repaid the taken Funds. At the same time, Illinois law makes clear that some of the Funds belong to the Plaintiff. A payable-on-death account in Illinois is not subject to the law of probate. *In re Schneider's Est.*, 127 N.E.2d 445, 449 (Ill. 1955). As a joint owner of such an account in Illinois, the Plaintiff was thus presumptively the owner the Funds in the Savings Account upon the death of Curtis. *Id.*; 205 ILCS 625/1-15. The Debtor has done nothing to rebut this presumption. The Debtor thus owes the Plaintiff a debt of $14,000.00 for the Funds taken from the Savings Account.

Further, as to the Funds in the Checking Account, as Curtis died intestate, Plaintiff as the surviving spouse was entitled to one half of the probate estate and Curtis's descendants are entitled to ratable shares of the remainder. 755 ILCS 5/2-1(a). The Debtor withdrew $1,200.00 from the Checking Account, leaving a balance of $1,818.78. The total in the Checking Account prior to the withdraw thus had to be $3,018.78. One half of the prior balance, or $1,509.39, presumptively belonged to Plaintiff. The Debtor left at least that amount in the Checking Account. It appears, therefore, that the Debtor did not withdraw any money belonging to the Plaintiff.

The Debtor is, therefore, liable for the Funds taken from the Accounts that did not belong to her, in the amount of $14,000.00.[3] A debt from the Debtor to the Plaintiff exists.

2.      *The Elements of Section 523(a)(2)(A)*

To except a debt from discharge under section 523(a)(2)(A) on the basis of actual fraud, a creditor must establish that (1) a fraud occurred, (2) the debtor intended to defraud and (3) the fraud created the debt that is the subject of the discharge dispute. *Jahelka*, 442 B.R. at 669.

(a)      Occurrence of Fraud

The fraud exception to dischargeability of debts does not reach constructive frauds, only actual fraud. *McClellan*, 217 F.3d at 894.[4] While there is no definite rule defining actual fraud, "it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *Id.* at 893 (*citing* 4 COLLIER ON BANKRUPTCY para. 523.08[1][e], p. 523–45 (15th ed., Lawrence P. King ed., 2000)). In *McClennan*, the court concluded that as common law fraud is not always in the form of a misrepresentation, a creditor does not have to allege misrepresentation and reliance in order to state a cause of action for actual fraud under section 523(a)(2)(A). *Id.* Fraud can be inferred from the totality of the circumstances if there is a clear picture of deceptive conduct by the debtor that suggests he or she intended to deceive or cheat the creditor. *Deady v. Hanson (In re Hanson)*, 432 B.R. 758, 772 (Bankr. N.D. Ill. 2010) (Squires, J.), *aff'd*, 470 B.R. 808 (N.D. Ill. 2012).

---

[3]      Though the Plaintiff also seeks $549.00 in court cost from the state court litigation, she has done nothing to show that she is entitled to recover the same under either Illinois or bankruptcy law.

[4]      Fraud "is constructive if the only evidence of it is the inadequacy of the consideration; it is actual if the debtor intended by the transfer to hinder his creditors." *Id.* at 894 (*citing Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995)).

The Debtor deceived many parties to obtain the Funds. She deceived TCF Bank when attempted to use the Power of Attorney after Curtis's death without informing the bank that Curtis had died. Had the Debtor informed TCF Bank, TCF Bank would not have honored the Power of Attorney. The Debtor had no right to withdraw money from the Accounts following Curtis's death.[5] The Debtor also deceived the Plaintiff by not informing her about the withdrawal and the existence of the Power of Attorney. Last, the Debtor deceived the Oak Lawn Police Department when she presented the altered Power of Attorney and represented that that version was the document she obtained from Curtis and presented to TCF Bank.

This is a clear pattern of deceit. The facts are unequivocal.

      (b)     <u>Intent</u>

Though the Debtor's actions show a clear pattern of deceit, the Debtor asserts that she had no intent to defraud. Much of the Trial focused on this issue.

A party seeking to establish that a debt is nondischargable under section 523(a)(2)(A) must prove the debtor's *scienter*—the intent to deceive, regardless of whether the claim is for a false representation, false pretenses, or actual fraud. *Mayer v. Spanel Int'l, Ltd.* (*In re Mayer*), 51 F.3d 670, 673 (7th Cir. 1995). Whether a debtor's intent was to deceive is measured by the debtor's subjective intention at the time of the alleged fraud, *Rae v. Scarpello* (*In re Scarpello*), 272 B.R. 691, 700 (Bankr. N.D. Ill. 2002) (Squires, J.), and may be established through direct evidence or may be inferred. *CFC Wireforms, Inc v. Monroe* (*In re Monroe*), 304 B.R. 349, 356 (Bankr. N.D. Ill. 2004) (Schmetterer, J.) (*citing In re Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995)). Fraudulent intent "may be determined from the totality of the circumstances of a case and may be inferred when the facts and circumstances present a picture of deceptive conduct on the debtor's part." *Cent. Credit Union of Ill. v. Logan* (*In re Logan*), 327 B.R. 907, 911 (Bankr. N.D. Ill. 2005) (Cox, J.) (*quoting In re Scott*, 294 B.R. 620, 628, 633 (Bankr. W.D. Pa. 2003)).

At the Trial, it was established that the Debtor took the Funds from the Accounts while knowing she had no right to do so. In so doing, it is clear that the Debtor intended to deprive the Plaintiff of her right to the Funds and used deceit to do so.

First, the Debtor obtained the Power of Attorney without informing the Plaintiff, Curtis's spouse and joint owner of the Savings Account. The Debtor had Curtis execute the Power of Attorney at his bedside while he was in hospice. "Death bed" transfers of power and assets are suspect generally for good reason. This one was more than suspicious; it was done in apparent violation of applicable law. The Power of Attorney was signed without either a disinterested witness or disinterested notary.[6]

---

[5]    In Illinois, the agency created by a power of attorney terminates upon the death of the principal. 755 ILCS 45/2-5.

[6]    "(a) Every property power shall bear the signature of a witness to the signing of the agency and shall be notarized. None of the following may serve as a witness to the signing of a property power or as a notary public notarizing the property power: … (3) a parent, sibling, or descendant, or the spouse of a parent, sibling, or descendant, of either the principal or any agent or successor agent, regardless of whether the relationship is by blood, marriage, or adoption;" 755 Ill. Comp. Stat. Ann. 45/3-3.6

8

Second, despite having the Power of Attorney for months, the Debtor failed to inform the Plaintiff of its existence. The Debtor first acted on the Power of Attorney on the day Curtis died. She ultimately used the Power of Attorney to withdraw the Funds from the Accounts—again, without informing the Plaintiff.

Third, the Debtor lied to the police by altering the Power of Attorney in an apparent attempt to authorize her actions. This is a clear indication that the Debtor both knew the Power of Attorney did not authorize her to act as she did and knew what she had done was therefore impermissible. Had the Debtor believed what she had done was correct, she would have just told the police the truth and not tried to hide it by altering the Power of Attorney.

While one suspicious act may be excused as circumstantial, many lead to clear and convincing evidence that a party intended to deceive. *Silverman v. Actrade Capital, Inc.* (*In re Actrade Fin. Techs. Ltd.*), 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005).

Last, the credibility of the witnesses is a crucial factor in a court's determination of intent. "Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *The Ward Family Foundation v. Arnette* (*In re Arnette*), 454 B.R. 663, 683 (Bankr. N.D. Tex. 2011); *see also Hanson*, 432 B.R. at 773.

When the Debtor testified, she appeared to be well versed on those items that supported her contentions. However, she would dissemble and delay when asked about matters that did not. The Debtor's testimony also conflicted with that of her daughter, Caprice Owens. For example, when asked about the meeting with her father in January, the Debtor testified it lasted about 30 minutes. Ms. Owens testified it lasted an hour. Tr. at p. 125, Mar. 9, 2021. The Debtor testified her father was sitting up in a chair when signing the power of Attorney while Ms. Owens testified he was in bed. *Id.* at p. 137. The Debtor's sister, Giovanne, testified she was only at the second meeting with Mr. Williams when he signed the Power of Attorney. The Debtor testified that Giovanne was at both meetings. *Id.* at pp. 114, 121-122, 136.

With respect to each of the discrepancies, it is telling that the Debtor's version is more in keeping with her attempt to cast the execution of the Power of Attorney as innocuous and routine, while the others' testimony sheds the Debtor in a less favorable light. This has the appearance of the Debtor once again attempting to deceive—this time the court.

The Debtor's testimony surrounding how and why she withdrew the Funds is equally telling. The Debtor made no effort to explain why she never informed the Plaintiff of the Power of Attorney or the withdraw of the Funds, why she made no effort to return the Funds, or why she was the only party who knew Curtis's "true" desired outcome of his estate. The entirety of the Debtor's testimony, Tr. at pp. 79-117; Mar. 9, 2021, paints a picture of the Debtor clearly acting to defeat her stepmother's interests. The Debtor's testimony that she did not feel that she did anything wrong, *id.* at p. 115, was both unconvincing and unsupported by the facts.

The Debtor's acts and her testimony demonstrate that when she obtained the Power of Attorney and used it withdraw the Funds from the Accounts she had the intent to deceive the Plaintiff. Regardless of whether the Debtor thought the ultimate result was justified, she knew the

9

actions she took were not. The Plaintiff has therefore demonstrated that the Debtor had the requisite *scienter* to satisfy the intent element of section 523(a)(2)(A).

           (c)      <u>Fraud Created the Debt</u>

The last element that the Plaintiff must prove is that the Debtor's fraud is the cause of the debt due to the Plaintiff. This is easily shown. But for the Debtor's fraudulent actions and intent, the Debtor would owe nothing to the Plaintiff. The debt is that for a wrongful withdrawal of the Plaintiff's Funds made with the requisite legal intent. *See* Claim No. 3-1, *In re Nottia M. Reed*, Case No. 18bk19801 (Bankr. N.D. Ill. filed July 16, 2018) (Barnes, J.).

The Plaintiff has therefore proven all elements of section 523(a)(2)(A) and the court finds that the debt due to the Plaintiff from the Debtor is nondischargeable.

B.      <u>Count II: 11 U.S.C. § 523(a)(4)</u>

Section 523(a)(4) provides that a debtor cannot discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny … ." 11 U.S.C. § 523(a)(4). For the purposes of section 523(a)(4), larceny is defined by federal common law. *In re Rose*, 934 F.2d 901, 903 (7th Cir. 1991). "Larceny requires a showing that the debtor wrongfully took property from its rightful owner with fraudulent intent to convert such property to its own use without the owner's consent." *John Deere Co. v. Broholm* (*In re Broholm*), 310 B.R. 864, 877 (Bankr. N.D. Ill. 2004) (Schmetterer, J.) (*citing id.* at 903). The intent required for larceny is specific. *In re Marshall*, 623 B.R. 123, 135 (Bankr. E.D. Pa. 2020). It requires more than proving general deceit.

In proving her case under section 523(a)(2)(A), the Plaintiff established that the Debtor took property of the Plaintiff's with fraudulent intent. All parties agree that the Debtor never informed the Plaintiff of the withdraw and the Debtor does not claim that she received consent from the Plaintiff to withdraw the Funds. The Debtor was unentitled to take the Funds the way that she did.

What is left is whether the Debtor specifically intended to convert the property for her own use.

Here, the Plaintiff's case falters. At the Trial, the Plaintiff made no effort to prove that the Debtor intended to convert property that was rightfully the Plaintiff's for the Debtor's own use. The Complaint generally pleads that the Debtor's withdraw of the Funds "shows an intent to convert the money withdrawn from [the Accounts] for her own use." Compl., at ¶ 18. No evidence was submitted or produced through testimony at the Trial to support the Debtor's intent to effect a conversion of property that rightfully belonged to another. The only testimony spoke to the manner (deceit) that the Debtor obtained the Funds.

The Debtor, in her defense, testified that she took the Funds both for her and her sister, thinking that was in keeping with her father's intent. Tr. at pp. 103–07, Mar. 9, 2021. Knowing that she had no right to take the Funds as she did and acting in a deceitful manner does not lead to the inevitable conclusion that the Debtor ultimately intended to convert the Funds.

Again, it is not enough to demonstrate that the Debtor acted in a deceitful manner and that her actions resulted in fraud as to the Plaintiff. More is necessary—a showing that the Debtor had a

fraudulent intent *to convert the property of the Plaintiff for her own use*—and it was the Plaintiff's obligation to provide that.

The Plaintiff has therefore failed to carry her burden with respect to Count II and judgment will be entered in favor of the Debtor on this count.

## CONCLUSION

The court therefore finds that the Plaintiff has proven by a preponderance of the evidence that section 523(a)(2)(A) has been satisfied and that the Debtor's debt due to the Plaintiff is not dischargeable. The same debt was created by the Debtor's actual fraud. The Plaintiff has not, however, proven that the Debtor has committed larceny.

Judgment in favor of the Plaintiff on Count I of the Complaint will be rendered. Judgment in favor of the Debtor on Count II of the Complaint will also be rendered. The result, nonetheless, is that the Debtor's debt to Plaintiff is nondischargeable. As a separate order will be entered concurrently to that effect.

Dated: September 3, 2021                                    ENTERED:


_____
Timothy A. Barnes
United States Bankruptcy Judge